UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                  :

JASON AUERBACH,                              :

                                    :         10 Civ. 2717 (PAE)

                           Plaintiff,         :

                                    :         OPINION & ORDER

                      -v-                :

                                    :

WELLS FARGO HOME MORTGAGE, INC.,    :

                                    :

                        Defendant.    :

                                    :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Jason Auerbach brings this claim against his former employer, defendant Wells

Fargo Home Mortgage, Inc. ("Wells Fargo"), alleging that Wells Fargo wrongfully withheld

various forms of bonus compensation in breach of Auerbach's employment agreement.  Pursuant

to an Opinion and Order issued on March 29, 2011, by the Hon. Richard J. Holwell, to whom

this case was then assigned, Auerbach's only remaining claim is for breach of contract.  That

claim relates to certain bonuses to which Auerbach was entitled, based on loans funded prior to

his termination on July 23, 2009, but which he alleges were not paid.  Wells Fargo now moves

for summary judgment on that claim.  For the reasons that follow, Wells Fargo's motion is

granted, except as to $7,550.20, which the evidence shows (and Wells Fargo concedes) it owes

Auerbach, as to which summary judgment is entered for Auerbach.

## I.      Factual Background

      The Court adopts the facts as set out in Judge Holwell's March 29, 2011 Opinion and

Order ("March 29, 2011 Opinion"), granting in part and denying in part Wells Fargo's motion

for judgment on the pleadings.  *See Bader v. Wells Fargo Home Mortg., Inc.*, 773 F. Supp. 2d 397, 403–06 (S.D.N.Y. 2011).  The Court assumes familiarity with those facts.

In summary, Auerbach joined Wells Fargo as a private mortgage banker in 2003; by 2005 he had been promoted to a sales manager in the New York office.  Auerbach was, by all accounts, a highly successful sales manager, and in 2008 the Manhattan branch, under Auerbach's leadership, was awarded President's Club status as one of the most profitable branches in America.  As a sales manager, between 2005 and 2009, Auerbach was eligible to receive various forms of incentive compensation in addition to his base salary, including, as relevant here, compensation based on the monthly volume of loans funded by employees reporting directly and indirectly to Bader ("Volume Overrides"), commissions based on monthly loan volume, President's Club bonuses, and partnership bonuses.

During the time period at issue in 2009, Auerbach was entitled to these types of incentive compensation pursuant to the Wells Fargo Home Mortgage 2007 Incentive Compensation Plan for Private Mortgage Banking Branch Sales Manager (the "2007 Compensation Plan"), the Wells Fargo Home Mortgage 2009 Incentive Compensation Plan for Private Mortgage Banking Branch Sales Manager (the "2009 Compensation Plan"), the President's Club addendum to the 2009 Compensation Plan, and the Wells Fargo Home Mortgage 2008 Partner Bonus Plan for Private Mortgage Bankers and Producing Sales Managers (the "Partner Bonus Plan").  *See* Affidavit of Mark Faktor ("Faktor Aff.") Exs. 1, 2, 20 (Dkt. 33); Affidavit of Edward Thomas ("Thomas Aff.") Ex. G (Dkt. 40).  The 2007 Compensation Plan applied, during the relevant period, up to and including March 31, 2009; the 2009 Compensation Plan applied, during the relevant period, beginning April 1, 2009 and thereafter.  *See* Faktor Aff. Ex. 1 at 1 [hereinafter 2009 Plan]. During the relevant period Auerbach was co-branch manager with Jeff Szymanski, the other co-

branch manager.  *See* Auerbach Dep. 28:16–30:6.  During the relevant period, the branch's

commissions, profits, and losses were divided 50/50 between Auerbach and Szymanski.  *Id.*

On July 23, 2009, Wells Fargo terminated Auerbach's employment.

## II.    Procedural History

On February 24, 2010, Auerbach brought suit in New York Supreme Court, New York

County, asserting claims for breach of contract, breach of implied contract, quantum meruit,

promissory estoppel, and violation of New York State Labor Law § 193.  *See* Compl. (Dkt. 1).

In his Complaint, Auerbach alleged that he was entitled to various kinds of incentive

compensation, including, *inter alia*, Volume Overrides, commissions, President's Club bonuses,

partnership bonuses, severance pay, and unreimbursed expenses.  On March 26, 2010, Wells

Fargo filed a notice of removal to this Court.

On July 6, 2010, Wells Fargo moved to dismiss the Complaint under Federal Rule of

Civil Procedure 12(b).  On March 29, 2011, Judge Holwell granted Wells Fargo's motion as to

all claims, with the exception of Auerbach's breach of contract claim as to (1) Volume Override

bonuses, to the extent Auerbach demonstrates there are any eligible loans that funded prior to his

July 23, 2009 termination, (2) commissions, to the extent Auerbach demonstrates there are loans

that funded prior to his termination or 30 days after his termination, unless the termination was

for misconduct, (3) President's Club bonuses, to the extent Auerbach demonstrates there are

loans that funded prior to his termination or 30 days after his termination, unless the termination

was for misconduct, (4) partnership bonuses, (5) a severance pay package, and (6) unpaid

reimbursable expenses.  On June 21, 2011, Wells Fargo filed its answer as to the remaining

claims in the Complaint.

On June 30, 2011, Wells Fargo served on Auerbach a request for the production of documents and a first set of interrogatories.  *See* Def.'s Mot. at 6 (Dkt. 39).  Auerbach responded and produced responsive documents.  On July 5, 2011, Auerbach served on Wells Fargo a request for the production of documents and a first set of interrogatories.  *Id.*  Wells Fargo, in turn, responded and produced responsive documents.  On August 30, 2011, Wells Fargo deposed Auerbach.

On August 31, 2011, the discovery period ended.  During the discovery period, Auerbach did not serve any notices of deposition, nor did he depose any of Wells Fargo's witnesses.  *See* Def.'s Mot. at 6.  On November 21, 2011, a pre-motion conference was held.  On January 9, 2012, Wells Fargo moved for summary judgment on Auerbach's remaining claim.

## III.   Discussion

### A.  Summary Judgment Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  The movant may discharge its burden by demonstrating that there is insufficient evidence to support the opposing party's claim, for which it bears the burden of proof at trial.  *See Celotex*, 477 U.S. at 322–23.

Once the moving party has adduced facts demonstrating that the opposing party's claims cannot be sustained, in order to survive the summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R.

[4]

Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not

rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted); *see

also FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) ("[T]he non-moving party

must do more than simply show that there is some metaphysical doubt as to the material facts,

and may not rely on conclusory allegations or unsubstantiated speculation.") (citation and

internal quotation marks omitted). Only disputes over "facts that might affect the outcome of the

suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  Breach of Contract Claim

Following the March 29, 2011 Opinion, the only remaining claims in the case are

Auerbach's breach of contract claims asserting an entitlement to: unpaid Volume Override

bonuses that funded prior to his termination; commissions that funded prior to or within 30 days

after his termination, unless the termination was for misconduct; President's Club bonuses that

funded prior to or within 30 days after his termination, unless the termination was for

misconduct; partnership bonuses; severance pay; and reimbursable expenses.

To state a breach of contract claim under New York law, a plaintiff must prove: "(i) the

formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of

defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns Inc.*, 660 F.3d 131, 142

(2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375

F.3d 168, 177 (2d Cir. 2004)). To evaluate whether Wells Fargo is entitled to summary

judgment on Auerbach's breach of contract claim, the Court evaluates as to each distinct form of

compensation whether Wells Fargo has established, as a matter of law, that it fully performed under the terms of the various operative compensation plans.

### 1. Volume Override bonuses

Auerbach alleges that he is entitled to receive $183,232 in unpaid Volume Override bonuses. *See* Compl. ¶ 75. However, Auerbach has failed to point to any evidence tending to show that Wells Fargo failed to perform as to the Volume Override bonuses under the 2007 or 2009 Compensation Plans. Auerbach asserts that from January 1 through June 30, 2009, his direct reports generated $539,405,044 of volume, entitling him to a $134,851 Volume Override bonus, and that from July 1 to July 23, 2009, he generated $166,175,551 of volume, entitling him to a $41,543 Volume Override bonus. *See* Compl. ¶¶ 71–72. Auerbach claims that he was instead paid an $83,025 bonus for 2009, and that he is due the difference between the amount paid and the amount owed for January 1 through July 23, 2009. *Id.* ¶ 74. However, despite these conclusory assertions, Auerbach fails to point to any evidence in support of his claim that he is entitled to these additional sums.

Wells Fargo, on the other hand, has produced convincing proof that Auerbach was paid in full for all Volume Override bonuses to which he was entitled. First, Wells Fargo business records establish that for January, February, and March 2009, the time period for which the 2007 Compensation Plan applied to his incentive compensation, Auerbach was eligible to receive $34,934.97 in Volume Override bonuses for loans funded during the period: $2,897.74 for January; $5,374.03 for February; and $26,663.20 for March. *See* Factor Aff. 14–19, Exs. 6–8. These amounts were calculated pursuant to the 2007 Compensation Plan, which provided for the calculation of Volume Override bonuses by (1) dividing the total loan count (the sum of Auerbach's loan count and that of his co-manager, Szymanski) by the total staff count (the sum

[6]

of Auerbach's staff count and Szymanski's) to obtain the units per staff, (2) dividing the total

volume (the sum of Auerbach's volume and Szymanski's) by the total staff count to obtain the

volume per staff, (3) adding Auerbach's total volume to Szymanski's to obtain the total eligible

volume, (4) invoking the volume override basis points rate ("bps") as provided in the 2007

Compensation Plan, *see* 2009 Plan at 10, (5) multiplying the eligible volume by the bps rate to

obtain the total branch payout, and (6) dividing the total branch payout by two to obtain

Auerbach's eligible payout. *See* Faktor Aff. Ex. 5. Wells Fargo, utilizing this formula pursuant

to the 2007 Compensation Plan, calculated that Auerbach was entitled to a $34,934.97 Volume

Override bonus for January 1 through March 30, 2009. Pay stubs provided by Wells Fargo

demonstrate that Wells Fargo paid Auerbach precisely $34,934.97 in Volume Override bonuses

for that period. *See* Faktor Aff. ¶¶ 14–19 & Ex. 2.

      Auerbach maintains that the appropriate method to calculate the Volume Override bonus

is to use an effective bps volume override rate of 2.5. He arrives at this rate by dividing a bps

rate of 5.0 (the amount he believes that the two Branch Co-Managers were collectively owed) by

2 (the number of Co-Managers, himself and Szymanski). *See* Compl. ¶ 65(b), n.2 ("Because

Auerbach was a Co-Manager, the 5 BPS of Override Volume he was entitled to as a Branch

Manager was split between himself and his Co-Manager, thus bringing his Volume Override

BPS to 2.5"). However, Auerbach provides no evidence to support his conclusion that this is the

correct methodology to derive the bps rate. On the contrary, the 2007 Compensation Plan

provides that for branches with monthly volume of $24 million and above, where the total units

per staff are between 1.5 and 2.49 (as was the case for Auerbach's branch from January to March

2009), the corresponding bps override rate is 2.0. *See* 2009 Plan at 10 (chart showing the

override rate that corresponded to various levels of total units per staff). A bps override rate of

up to 5.0 is used when the total units per staff is above 3.5; however, that was not the case in Auerbach's branch during the relevant time period. *See* Faktor Aff. Ex. 5. Accordingly, the appropriate amount to divide between the two branch managers should be calculated using a 2.0 bps, not the 5.0 bps used by Auerbach. Compl. ¶ 65(b).

The period between April 1, 2009 and July 23, 2009 is governed by the 2009 Compensation Plan, which used a different formula to calculate Volume Override bonuses. *See* Faktor Aff. Ex. 2. In this period, Auerbach's Volume Override entitlements were calculated by (1) dividing the Net Operating Income ("NOI") by the NOI volume (both stated on Auerbach's monthly override worksheet, *see* Faktor Aff. Exs. 9–12), and multiplying that result by 10,000 to obtain the NOI bps rate, (2) dividing the NOI by the NOI units to obtain the NOI per loan, (3) adding Auerbach's and Szymanski's affluent unit counts to obtain the total affluent unit count, (4) using the affluent unit count, the NOI per loan, and the NOI bps to determine the corresponding tier level, as provided in the 2009 Compensation Plan (*see* Faktor Aff. Ex. 2 at 12) to obtain the bps rate, (5) adding Auerbach's total volume to Szymanski's to obtain the total eligible volume, (6) multiplying the eligible volume by the bps rate to obtain the total branch payout, and (7) dividing the total branch payout by two to obtain Auerbach's eligible payout. *See* Faktor Aff. Ex. 5.

Wells Fargo, utilizing this formula pursuant to the 2009 Compensation Plan, calculated that Auerbach was entitled to a $14,405.96 Volume Override bonus for April, a $10,884.20 bonus for May, a $12,334.06 bonus for June, and a $10,687.54 bonus for the period July 1 to July 23, 2009. *Id.* Auerbach's paystubs, in turn, demonstrate that he was paid the $14,405.96

[8]

bonus in the pay period following April 2009 (the pay period ending May 23, 2009)[1] and the

$10,884.20 bonus in the pay period concurrent with May 2009 (the same pay period, ending May

23, 2009)[2], the amounts of Volume Override bonuses to which he was entitled for those two

months, as established by Wells Fargo's business records.  *See* Faktor Aff. Exs 5, 9, 10.  As for

June, Auerbach's paystubs show that he was paid only a $4,538.32 bonus, *i.e.*, $7,795.74 less

than the amount to which he was entitled.  In July, due to accounting errors now admitted by

Wells Fargo, Auerbach was paid $11,824.09, *i.e.*, $1,136.55 more than the amount to which he

was entitled.  *See* Faktor Aff. Exs. 5, 11, 12.  Accordingly, netting these figures, the documentary

evidence provided by Wells Fargo convincingly demonstrates that Auerbach was underpaid and

is entitled to $6,165.20 in unpaid Volume Override bonuses from June and July 2009.

Auerbach has failed to point to any evidence that tends to contradict this calculation,

based on Wells Fargo's business records.  Aside from the $6,165.20 net underpayment,

Auerbach has failed to identify any specific loan that funded prior to his July 23, 2009

termination as to which there is evidence that he was not paid his required bonus.  *See* Def.'s

Mot. at 9.  Finally, and most revealingly, Auerbach admits that prior to his departure from Wells

---

[1] In fact, Auerbach was paid a $26,704.31 bonus in the period following April 2009 due to an internal accounting error, which Wells Fargo admits.  *See* Faktor Aff. Exs. 5, 9.  Following a "miscellaneous adjustment" subtracting $12,298.35 from Auerbach's Volume Override bonus in June, Auerbach was left with the proper $14,405.96 bonus for April 2009.

[2] The overpayment of $26,704.31 in the period following April 2009 was greater than Auerbach's actual April 2009 entitlement by $12,298.35.  Accordingly, Auerbach was paid in the period following April 2009 an amount greater than the $10,884.20 bonus to which he was entitled for May 2009.  Because Auerbach was incorrectly paid a bonus for April that was higher than his entitlement for both April and May, the Volume Override payment that Auerbach received in the period following April 2009 ($26,704.31) satisfied Auerbach's Volume Override bonus entitlement for both April and May.  Auerbach did not receive any additional Volume Override payment in the period following May 2009.  Following the May entitlement, Wells Fargo was at a Volume Override deficit of $1,414.15, meaning that Auerbach had been overpaid in the amount of $1,414.15.

Fargo, he was paid $77,199.05 in Volume Override bonuses for loans funded in 2009.  *See* Auerbach Dep. 111:19–112:12.  This amount, which Auerbach himself *admits* having received from Wells Fargo for loans funded in 2009, is the exact amount of Volume Override bonuses that the documentary evidence demonstrates Auerbach was paid for that period, and $6,165.20 short of the amount to which Auerbach was entitled.  Accordingly, in the absence of any evidence that Auerbach was entitled to additional Volume Override bonuses under the 2009 Compensation Plan, the Court concludes from all available evidence that Auerbach was entitled to $83,246.73 in Volume Override bonuses for 2009, and received $77,199.05 in Volume Override bonuses for all loans funded in 2009 before his departure.

### 2. Commissions

Auerbach alleges that he is entitled to receive $169,000 in unpaid commissions on loans "that he earned while employed at Wells Fargo."  Compl. ¶ 76.  There are three general types of loans implicated by this claim: (1) loans which funded prior to Auerbach's termination; (2) loans which funded within 30 days of his termination; and (3) loans which funded more than 30 days after his termination.  The Court evaluates in turn Auerbach's claim for unpaid commissions as to each type of loan.

### a. Loans which funded prior to termination

The 2009 Compensation Plan provides that "net commissions shall be paid . . . on the actual funding of mortgage loans," or all loans actually funded during employment.  2009 Plan at 15.  Auerbach has failed to adduce any evidence tending to show that Wells Fargo failed to perform under the 2007 or 2009 Compensation Plans as to commissions owed on loans that funded prior to his termination.  Specifically, although Auerbach generally asserted in his deposition that certain loans funded prior to his departure for which he was not paid

commissions, Auerbach has not provided any evidence to support his claim.  *See* Auerbach Dep. 117:18–119:21.  Wells Fargo, on the other hand, has provided business records showing that Auerbach was paid all commissions on loans that funded prior to his termination.  These records substantiate Wells Fargo's assertion that Auerbach was owed $125,256.96 in commissions for loans funded prior to his termination in 2009 ($77,199.05 for loans funded between January 1 and March 30, 2009, *see* Faktor Aff. Ex. 13, and $48,057.91 for loans funded between April 1 and July 23, 2009, *see* Faktor Aff. Exs. 14–17), and Auerbach's pay stubs demonstrate that he was paid the $125,256.95 that he was owed.  *See id.* Ex. 4 at 12, 14, 19, 21.  Even viewed "in the light most favorable" to Auerbach, the Court finds that his conclusory assertion, made without any citation to "particular parts of materials in the record," could not serve as the basis of a finding by a reasonable jury that Auerbach is owed commissions on loans that funded prior to his termination for which he was not paid.  *Celotex Corp.*, 477 U.S. at 323; Fed. R. Civ. P. 56(c)(1). Accordingly, Auerbach has failed to state a breach of contract claim as to commissions on loans which funded prior to his termination.

### b.  Loans which funded within 30 days of his termination

Under the 2009 Compensation Plan, employees are eligible to receive commissions on "loans which fund within thirty (30) days after termination of employment."  2009 Plan at 15. However, the Compensation Plan also provides that "if [the] Employee engages in misconduct, [the] Employee will not be eligible to earn monthly commission credit."  *Id.*  The Compensation Plan defines "misconduct" to mean

> improper conduct including, but [] not limited to: 1) violation of statutory, regulatory or any other compliance requirements applicable to [Wells Fargo's] business activities; 2) a breach of trust or dishonesty; 3) violation of the Code of Ethics; 4) a breach of Employee's Employment Agreement or Trade Secrets Agreement with [Wells Fargo] and all exhibits and attachment thereto; and/or 5)

brokering loans outside of [Wells Fargo] or one of its affiliates without [Wells Fargo's] knowledge and approval.

*Id.* Wells Fargo alleges that Auerbach is not entitled to commission on loans that funded within 30 days of his termination because he was terminated for misconduct. The Court agrees.

Wells Fargo has provided ample evidence supporting its claim that Auerbach was terminated for misconduct, and thus ineligible to receive commissions on loans that funded within 30 days after termination, pursuant to the 2009 Compensation Plan. Edward Thomas, a Wells Fargo Regional Manager and Auerbach's supervisor, and Julie Miller, a Wells Fargo Employee Relations Consultant, each attest that on July 10, 2009, they participated in a telephone conference concerning Auerbach and another Wells Fargo employee, and in that conference they were made aware of allegations by Wells Fargo employees that Auerbach's behavior had "created and perpetuated an unhealthy work environment." *See* Thomas Aff. ¶¶ 1, 4; Miller Aff. ¶¶ 1, 6. Thomas, the supervisor and decisionmaker, attested that he took the "lead role in overseeing the confidential fact finding investigation," and that Miller, an advisor to management on personnel issues, was the fact finder. Thomas Aff. ¶ 7. On July 16, 2009, Auerbach was placed on administrative leave. *See id.* ¶ 9 & Ex. G. In sworn statements, Thomas and Miller each described the ensuing investigation, which involved interviewing 17 employees (whom Miller deemed to be credible), and reviewing email correspondence and other documents related to the allegations. Miller attests that following the investigation, she recommended to Thomas that Auerbach be terminated "for misconduct involving violation of company policies, including the Workplace Conduct Policy, the Non-Retaliation Policy, the Personal Relationship at Work Policy, the Professionalism Policy, and the Code of Ethics in Business Policy." Miller Aff. ¶ 32. Thomas attests that Auerbach's misconduct involved "violations of company policies relating to concerns of his management of the office, including

interactions with employees, the way in which he distributed customers and leads, and concerns regarding retaliatory and threatening management style."  Thomas Aff. ¶ 12.  On July 23, 2009, one week after he was placed on administrative leave, Auerbach was "terminated for misconduct."  *Id.* ¶ 14.

For his part, Auerbach claims that although he was interviewed in connection with an internal investigation, he was told by Thomas at the time of the interview that (1) "he was not the subject of the investigation," (2) "he was not being accused of any wrongdoing," and (3) "he was not being accused of violating company policy."  Pl.'s Opp. to Def.'s Mot. at 7 (Dkt. 43); *see also* Auerbach Dep. 146:3–148:12.  Second, Auerbach asserts that at the time of his termination he "was not given a reason for his termination and was unaware of any violations of [Wells Fargo's] policies."  Pl.'s Opp. to Def.'s Mot. at 7.

Auerbach's factual assertions, even if assumed to be true as the Court must on Wells Fargo's motion for summary judgment, do not come close to creating a material dispute of fact. Auerbach's account of what Thomas told him during the investigation is irrelevant: statements during the investigation *preceded* the decision to terminate Auerbach's employment.  The relevant issue is what Wells Fargo's basis was for terminating Auerbach, and Thomas's alleged statements to Auerbach at an earlier point, during his interview, do not tend to disprove that Wells Fargo, following its investigation, later decided to terminate Auerbach for misconduct. Quite to the contrary, it is entirely plausible that—as both Miller and Thomas assert in their declarations—during the course of the investigation they uncovered evidence that caused them to determine that Auerbach had violated Wells Fargo's workplace conduct policies.  Also beside the point is Auerbach's claim that he "was not given a reason for his termination."  *See* Pl.'s Opp. to Def.'s Mot. at 7; Auerbach Dep. 140:5–141:11.  Even if true, as the Court assumes for

the present purpose, whether Wells Fargo informed Auerbach that he was being terminated for misconduct does not, by itself, disprove that that was the basis for its action.  Auerbach does not allege that Wells Fargo had a duty to inform him of the reason for his termination, and the provisions relating to termination for misconduct in the 2009 Compensation Plan do not require that the employee be notified that the termination was for misconduct.  The Court notes, as well, that Auerbach was, undisputedly, an employee at will.  Auerbach had the opportunity to pursue discovery, and to attempt to show that his termination was for a reason or reasons other than misconduct.  He elected not to do so, including electing not to conduct depositions of individuals involved in the investigation or subpoena documents bearing on the basis for his termination.  Auerbach has, thus, failed to come forward with any evidence tending to dispute Wells Fargo's account of its reason for termination.

Wells Fargo, on the other hand, has put forward sworn statements from both individuals who conducted the investigation, recommended that Auerbach be terminated for misconduct, and made the final decision to terminate.  Both attest that the termination was based on a finding of misconduct.  Miller explained that various interviewees complained that Auerbach favored certain employees, treated employees inequitably, yelled at employees, and threatened not to give employees certain opportunities.  Miller Aff. ¶¶ 23, 26, 28.  Wells Fargo has also produced documentary evidence demonstrating that Auerbach was placed on administrative leave, consistent with an investigation into potential misconduct.  Miller Aff. Ex. A.  This evidence is more than sufficient to support a conclusion that the basis for Auerbach's termination was a

finding of misconduct.  In light of Auerbach's failure to adduce any evidence, his general denials do not create a material question of fact.[3]

Because the evidence uniformly shows that Auerbach was terminated from Wells Fargo for misconduct, under the 2009 Compensation Plan, he is not entitled to commissions on loans that funded within 30 days after his termination.

### c.  Loans which funded more than 30 days after his termination

The 2009 Compensation Plan provides that: "No commission shall be earned for loans which fund more than thirty (30) days after the date of termination of employment."  2009 Plan at 15.  The March 29, 2011 Opinion held that "Auerbach cannot recover commissions for loans in the pipeline as of July 23, 2009," with the caveat that at the motion to dismiss stage, the Court could not resolve whether Auerbach had been terminated for misconduct, and thus "whether Auerbach is entitled to commissions on loans funded within thirty days after his termination." *Wells Fargo Home Mortg., Inc.*, 773 F. Supp. 2d at 412.

Auerbach asserts that he is entitled to compensation for various loans that funded more than 30 days after his termination, because Wells Fargo "intentionally delayed" the funding of those loans.  Pl.'s Opp. to Def.'s Motion at 16.  Specifically, Auerbach claims that he is entitled to a $10,000 commission for loans that had "exorbitant extensions," a $15,000 commission for loans subject to "intentional delays," a $104,000 commission for loans in Auerbach's locked

---

[3] Nor, to the extent Auerbach may be taken to imply that Wells Fargo's decision to terminate him was incorrect, may the Court second-guess that determination.  That contention is not fairly subsumed in his contract claim, and it is not the role of this Court to second-guess rational business judgments.  *See Muhleisen v. Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 385 (S.D.N.Y. 2009) (citing *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process")); *Velez v. SES Operating Corp.*, No. 07-cv-10946, 2009 WL 3817461, at *13 (S.D.N.Y. Nov. 12, 2009) (citing *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("[I]t is not the function of a fact-finder to second-guess business decisions.")).

pipeline on the date of his termination "that were to be closed within the year," and a $40,000 commission for the purchase mortgage component of the "Harvey Ross Loan," which Auerbach asserts was guaranteed to him by Wells Fargo.  Compl. ¶ 76.

Auerbach does not dispute that each of these loans funded more than 30 days after the date of his termination.  Instead, he asserts that he is entitled to commissions on these loans due to various alleged acts by Wells Fargo to delay the finding of those loans or otherwise impede him from obtaining loans that otherwise would have funded prior to his termination or within 30 days of it.  Compl. ¶¶ 76–83.  However, Auerbach provides no evidence to support this claim. Further, the 2009 Compensation Plan unambiguously and unconditionally states that employees are not entitled to commissions on loans that fund more than 30 days after that employee's termination from Wells Fargo.  Thus, even if Auerbach had provided evidence to support the assertion that delays in the funding of various loans were "exorbitant" and "intentional," or that he was given verbal assurances that he would receive commissions on the loans that funded outside those parameters, such a claim would still fail, based on the clear language of the 2009 Compensation Plan.  Simply put, the 2009 Compensation Plan does not provide any exceptions. Accordingly, the Court finds as a matter of law that Auerbach is not entitled to commissions on any loans that funded more than 30 days after his termination.

In sum, Auerbach has failed to point to any evidence tending to show that Wells Fargo failed to perform its obligations as to commissions owed under the 2007 or 2009 Compensation Plans.  Summary judgment must be granted to Wells Fargo with respect to the breach of contract claim based on commissions.

### 3.  President's Club bonuses

As a member of the President's Club, and pursuant to the President's Club addendum to the 2009 Compensation Plan, Auerbach was entitled to receive an additional commission bonus on his monthly funded loans.  *See* Faktor Aff. ¶ 45, Ex. 20.  Auerbach alleges that he is entitled to $8,000 in President's Club bonuses: $4,000 from additional commission credit on his branch's loan volume; and $4,000 from loans in his locked pipeline on the date of his termination.  Auerbach does not allege that he is entitled to any unpaid President's Club bonuses on loans that funded prior to his termination.

The President's Club addendum provides that "[e]ach provision of [the 2009 Compensation Plan] that is not superseded by this Addendum remains in full force and effect and applies toward commission credit awarded under this Addendum."  Faktor Aff. Ex. 20. Accordingly, the same provision discussed above relating to commissions applies equally to President's Club bonuses; namely, that employees are entitled to commissions on loans that funded prior to termination in all circumstances, and to commissions on loans that fund within 30 days after termination *if* that termination was not the result of employee misconduct.  However, no commissions are due for loans that fund more than 30 days after termination.  *See Wells Fargo Home Mortg., Inc.*, 773 F. Supp. 2d at 412.

Because, as the Court has found, Auerbach was terminated for misconduct, under the 2009 Compensation Plan, he is not entitled to President's Club bonuses on loans that funded within 30 days of his termination.  Nor is he entitled to commissions on loans that funded more than 30 days after termination, because the 2009 Compensation Plan does not provide for the payment of commission on any loans funded more than 30 days after termination, regardless of

whether or not they were in a "locked pipeline."  Auerbach, therefore, is not entitled to President's Club bonuses on any such loans.

### 4.  Partnership bonuses

Auerbach's bonus compensation was also governed by the 2008 Partner Bonus Plan, an addendum to the 2007 and 2009 Compensation Plans, which provided for additional performance-based bonuses.  The 2008 Partner Bonus Plan provides that if an employee is involuntarily terminated between January 1, 2009 and December 31, 2009, for reasons other than a "qualifying event," the employee "forfeits all [p]oints remaining at the time of termination and no further bonus is due."  Thomas Aff. Ex. G at 5.  A "qualifying event" is defined in the Wells Fargo Benefits Book as either a "position elimination" or a "substantial position change." Thomas Aff. Ex. F at 11-4.  A "position elimination" is defined as "an elimination of your job or any other form of a reduction in force initiated by Wells Fargo"; a "substantial position change" occurs when "management changes your existing position or your position is eliminated and you are transferred to or offered another position."  *Id.*

Auerbach asserts that he was terminated for a "qualifying event," meaning he did not forfeit all points under the plan, and that he was entitled to a $25,000 partnership bonus.  He claims that he experienced a "position elimination" within the meaning of the plan, because the position he vacated was never "posted for, it was never revived, it was never implemented." Auerbach Dep. 128:19–21.   However, Auerbach has pointed to no evidence whatsoever that his position was eliminated.  Wells Fargo, on the other hand, has come forward with sworn testimony by Thomas, the Regional Manager, that another individual took Auerbach's position after his termination.  Thomas Aff. ¶ 29.

[18]

Auerbach claims that a material question of fact exists on this point, because Wells Fargo failed to provide evidence that the individual now occupying Auerbach's position had the same compensation-sharing arrangement as Auerbach had.  That claim is beside the point, and does not rescue Auerbach's claim.  To survive a summary judgment motion, Auerbach must state a viable claim for relief.  *See Great Am. Ins. Co.*, 607 F.3d at 292 (plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation") (citation and internal quotation marks omitted).  Here, Auerbach has failed to point to any evidence whatsoever that he experienced a "qualifying event" and his supposition that his successor had differing compensation arrangement than he had, even if credited, simply would not make his termination a "qualifying event."  Rather, the unambiguous definition of a "qualifying event" as provided in the plan shows that Auerbach's termination was decidedly *not* a qualifying event.  It provides that an employee is "immediately ineligible" if the employee is "discharged for a reason *other than a qualifying event* (including but not limited to, poor performance, *violation of Wells Fargo's Code of Ethics and Business Conduct, or Wells Fargo's employment policies*)."  Thomas Aff. Ex. B at 11-4 (emphasis added).  Auerbach was, undisputedly, terminated by Wells Fargo for misconduct, which, according to the uncontradicted testimony of the company's affiants, entailed finding that he violated the company's code of ethics and employment policies.  Miller Aff. ¶ 32.  Accordingly, Auerbach has failed to state a claim for entitlement to partnership bonuses under the 2008 Partner Bonus Plan.

### 5.  Severance pay

Auerbach alleges that he is entitled to pay equal to six months of compensation and benefits, or $300,000, because he was "terminated without notice, reason, justification or cause."

[19]

Compl. ¶¶ 15, 101.  The Wells Fargo Salary Continuation Plan provides for continuation of pay for those employees who experienced a "qualifying event" as defined by the plan.  For the reasons stated above, Auerbach did not experience a "qualifying event"—or a "position elimination"—when he was terminated for misconduct.  Thomas Aff. Ex. F at 11-4.  Under the Salary Continuation Plan, termination for misconduct precludes all claims for severance pay under the plan.  *See id.*  Accordingly, Auerbach's claim for unpaid severance fails as a matter of law.

### 6.  Reimbursable expenses

Auerbach alleges that he is owed $1,385 in unreimbursed expenses.  Wells Fargo does not dispute that Auerbach is owed that amount.  *See* Def.'s Mot. at 17.  Accordingly, the Court finds that Auerbach is entitled to $1,385 of unpaid expense reimbursement from Wells Fargo.

*          *          *

In sum, aside from the $6,165.20 in unpaid Volume Override bonuses to which the Court finds that Auerbach is entitled under the 2009 Compensation Plan, and the $1,385 in unreimbursed expenses, Auerbach makes no more than conclusory allegations in support of his claim that he is owed additional bonuses or other compensation.  The documentary evidence emphatically supports Wells Fargo's assertion that it did, in fact, pay Auerbach all performance-based compensation, aside from the outstanding $7,550.20, to which he was entitled under the 2007 and 2009 Compensation Plans.  Because Auerbach fails to establish an essential element of his breach of contract claim under New York law—namely, that Wells Fargo in fact failed to perform under a binding contract—Auerbach's remaining claims cannot be sustained. Accordingly, the Court finds that Auerbach is entitled to $6,165.20 in unpaid Volume Override

bonuses as a matter of law, as well as $1,385 in unreimbursed expenses, and that all other claims in the Complaint must be dismissed.

### CONCLUSION

For the reasons discussed above, the Court finds that Auerbach is entitled to $6,165.20 in unpaid Volume Override bonuses pursuant to the 2009 Compensation Plan and $1,385 in unreimbursed expenses. Wells Fargo's motion for summary judgment on Auerbach's remaining breach of contract claims is hereby GRANTED. The Clerk of Court is directed to close docket item 28, enter judgment for the plaintiff in the amount of $7,550.20, and terminate the case.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: May 15, 2012
New York, New York

[21]